THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
EUGENE LOPEZ, Appellant.

Second Department, December 23, 1985

## APPEARANCES OF COUNSEL

*Martin S. Dorfman* for appellant.

*John J. Santucci, District Attorney (John Castellano* of counsel), for respondent.

## OPINION OF THE COURT

WEINSTEIN, J.

Defendant was originally charged by a Queens County Grand Jury with one count of murder in the second degree, two counts of criminal use of a firearm in the second degree and criminal possession of a weapon in the second degree emanating from the shooting of Edward Necci with a handgun on May 19, 1982. On the People's motion, the criminal use of a firearm counts were dismissed. After two trials on the murder and criminal possession counts, defendant was convicted of the lesser included offense of manslaughter in the first degree. The fact that the victim died at defendant's hands is beyond dispute. By defendant's own admission, he shot Necci in the course of an altercation. According to competent medical authority, Necci sustained five gunshot wounds and died as a result of internal hemorrhaging caused by those wounds.

After advising the defendant of his rights, the police took a statement from him at the precinct on the day of the incident. Defendant at that time informed the police that on the afternoon of the shooting he had received a telephone call

from Necci, with whom he had been acquainted for approximately two years, with regard to a burglary of defendant's apartment which had occurred some two to three weeks previously. Defendant permitted Necci to come to his apartment in order to discuss the burglary. Necci apparently intended to obtain money from defendant in exchange for his information concerning the burglary. To Officer Cesternino, who had responded to the scene and traced a trail of blood from the pizza shop where the victim was found back to defendant's apartment, defendant initially stated "I caught the guy" and motioned to a pair of pliers lying at the base of the stairway leading to his apartment. Defendant later made the following admission: "I knew the guy. We argued, we fought. I shot him" and pointed to a gun which was lying on a couch in his apartment.

The defense rests heavily upon the testimony of Marc McDermott, who was painting the front room of defendant's apartment at the time of the shooting. Approximately 20 minutes after Necci arrived at the apartment, McDermott heard arguing coming from the room where defendant and Necci were. He also heard defendant say something about a "rip off". McDermott then heard a gunshot and immediately proceeded to the room and opened the door, whereupon he observed defendant holding a gun on Necci. Although defendant repeatedly told Necci to turn around and keep his hands behind his back, Necci lunged at defendant with a silvery, railroad spike-type object. McDermott then heard a number of gunshots in rapid succession followed by the sound of breaking glass. He took cover behind a wall. When McDermott returned to where he could get a view of the room in which the altercation took place, he saw defendant seated atop some broken glass attempting to get up. Necci, who was standing over defendant, ran past McDermott who unsuccessfully tried to restrain him. Necci fled down the stairs followed by defendant who still held the gun.

It bears noting that McDermott had previously told the police who approached him at the scene that he had not viewed the shooting, but that he had stayed in the bedroom during the entire incident because he was frightened. McDermott also admitted on cross-examination that he loved defendant like a brother, that he did not want to see him convicted and that he would lie for defendant if he had to. The credibility of such a witness is, at best, suspect.

Defendant's application for a trial order of dismissal on the

ground that the People had failed to prove that defendant, in shooting the deceased, had intended to cause his death or that he had not acted in self-defense was denied. After requesting additional instructions on manslaughter in the first degree the jurors returned a verdict finding defendant guilty of that crime.

■ On appeal, defendant contends, *inter alia,* that the integrity of the Grand Jury's deliberations was impaired by the presentation of an autopsy report containing factual errors, the use of an alias for defendant in the title of the matter, and the failure of the District Attorney to instruct the Grand Jury as to the essential elements of the defense of justification and the People's burden to disprove the defense beyond a reasonable doubt. We find that all these contentions lack merit.

We have inspected the Grand Jury minutes which resulted in defendant's indictment, as well as the impaneling instruction minutes. The disputed autopsy report was not introduced into evidence, and the use of the name "Buddha" by witnesses indicated that it was a nickname rather than an alias with criminal connotations. Accordingly, defendant was not prejudiced. Further, the District Attorney advised the Grand Jury of the relevant sections of Penal Law article 35 on the defense of justification. Accordingly, the District Attorney's duty as legal advisor to the Grand Jury was fulfilled *(see,* CPL 190.25 [6]; *People v Valles,* 62 NY2d 36; *People v Davis,* 119 Misc 2d 1013, 1022-1023).

While neither the impaneling court nor the District Attorney advised the grand jurors that it was the District Attorney's burden to disprove the defense of justification beyond a reasonable doubt, the absence of such an instruction does not constitute error. The District Attorney bears no such burden in Grand Jury proceedings. Such burden arises only at trial *(see,* Penal Law § 25.00 [1]; § 35.00). "The Grand Jury is not * * * charged with the ultimate responsibility of determining the guilt or innocence of the accused * * * That duty * * * resides with the petit jury, which has the obligation of assessing the evidence in light of the applicable legal rules and determining whether the People have proven the guilt of the accused beyond a reasonable doubt" *(see, People v Calbud, Inc.,* 49 NY2d 389, 394). The primary function of the Grand Jury "is to investigate crimes and determine whether sufficient evidence exists to accuse a citizen of a crime and subject him or her to criminal prosecution" *(People v Calbud, Inc., supra,*

at p 394). A Grand Jury may indict when the evidence before it is "legally sufficient" to establish that the accused committed the offense, and there is competent and admissible evidence before it which provides reasonable cause to believe that the accused committed the offense (CPL 190.65 [1]). "At the accusatory stage, legally sufficient evidence is prima facie evidence, not proof beyond a reasonable doubt" *(People v Porter,* 75 AD2d 901). The Grand Jury was adequately instructed by the impaneling court on the correct standard for indictment. Accordingly, the Grand Jury proceeding conformed to the requirements of CPL article 190 and the integrity thereof was not impaired. Dismissal of the indictment is not required *(see,* CPL 210.35 [5]).

We note that case law concerning "grand jury reports" (CPL 190.85) cited by defense counsel is inapposite here, where an indictment is concerned. The standards of proof differ for an indictment and a report. A Grand Jury report must be supported by a "preponderance of the credible and legally admissible evidence" (CPL 190.85 [2] [a]), while an indictment must be supported by "prima facie" evidence *(see, People v Porter,* 75 AD2d 901, *supra;* CPL 190.65 [1]). Accordingly, defendant's reliance on the Grand Jury report case law is misplaced.

█ It is clear from the record that defendant's guilt was established beyond a reasonable doubt and that the jury was entirely justified in rejecting defendant's claim of self-defense. Any potential error with regard to the trial court's charge on justification has not been preserved for appellate review inasmuch as no timely objection was taken at trial at a point when the court could have been alerted to any flaw and taken appropriate steps to effect a cure *(see,* CPL 470.05 [2]). Moreover, defendant's counsel has not even framed the issue in his appellate brief as a basis for reversal. Under these circumstances, the interest of justice, as we perceive that interest to be, does not compel the reversal of the judgment of conviction *(cf. People v Macon,* 110 AD2d 718; *People v Fuller,* 108 AD2d 822). A brief review of the trial court's instructions pertaining to the justified use of deadly physical force is in order. The relevant portion of the charge follows:

"The defense has asserted a defense of justification. The burden is on the People to disprove that defense beyond a reasonable doubt. By claiming justification, the Defendant has added another element to those I have already given you, which the People must establish beyond a reasonable doubt before you can find the Defendant guilty.

"Now, you have heard reference to justification throughout the trial. Justification is a legal term used to describe a defense, and is relevant to the present case as defined in the following manner:

" 'A person may use physical force, other than deadly physical force, upon another person when and to the extent he reasonably believes such force to be necessary to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless: A, the latter's conduct was provoked by the actor himself with intent to cause physical injury to another person, or B, the actor was the initial aggressor, except that in such case his use of such physical force is nevertheless justifiable if he has withdrawn from the encounter and effectively communicate *[sic]* such withdrawal to such other person, but the latter persists in continuing such incident by the use or threatened imminent use of unlawful physical force.'

"A person may not use deadly physical force upon another person under circumstances mentioned above unless he reasonably believes that such person is using or about to use deadly physical force. Even in such case, however, he may not use deadly physical force if he knows that he can, with complete safety to himself and others, avoid the necessity of doing so by retreating. Except that he is under no duty to retreat if he is in his dwelling and not the initial aggressor. Or he reasonably believes that such person is committing or attempting to commit a robbery.

"Deadly physical force means physical force which under the circumstances in which it is used is readily capable of causing death or other serious physical injury. Serious physical injury means a physical injury which creates a substantial risk of death, or which causes serious and protracted disfigurements, protracted loss or impairment of the function of any bodily organ.

"In considering the defense of justification in this case, you should consider whether the Defendant's stated claim of justification is reasonable in the light of his knowledge of the circumstances as they existed at the time of the incident. The test of reasonableness is not what the ordinary prudent man would have done with the same knowledge and under the same circumstances, but whether his claim of justification is reasonable in the light of what he must have thought at the time of the incident. Nor is it required in the defense of

justification that you find that the Defendant was in actual peril from the use or imminent use of unlawful physical force or deadly physical force. It is sufficient if the Defendant reasonably believed that he was in such peril. Justification as defined is a defense meaning that when raised by the person accused, the People have the burden of disproving the defense of justification beyond a reasonable doubt. Therefore, unless you find, both, that the People have proved all the elements of the offenses charged beyond a reasonable doubt, and also that they have disproved the defense of justification beyond a reasonable doubt, you must vote to acquit the Defendant."

This portion of the charge, as our dissenting colleague candidly admits, closely follows the statutory language (see, Penal Law § 35.15 [2]). While the possibilities for speculating the ways in which jurors might have been confused by the justification charge are legion, the fact remains that this jury was entirely justified in rejecting defendant's claim of self-defense. The self-defense claim was dependent upon the testimony of Marc McDermott whose credibility was seriously impugned by his admission that he would lie for defendant if he had to. Similarly damaging was the impeachment of McDermott by his own prior inconsistent statements to two investigating police officers. The jurors, as the ultimate triers of fact, were clearly empowered to resolve the issue of McDermott's credibility in the People's favor (see, People v Woods, 99 AD2d 556), thus toppling the justification defense. It is difficult to conceive how a different justification charge could have resulted in an assessment of credibility more favorable to defendant.

Apart from considerations of credibility, defendant's self-defense claim must fail for another reason. Defendant, who had become irate at Necci's attempt to sell him information, had a motive to harm or at least frighten the deceased. After the gun had already been fired once, defendant continued to point the weapon at Necci and repeatedly ordered him to turn around and keep his hands behind his back. At this juncture, Necci could reasonably have believed that his life was in danger and his alleged attempt to stab defendant with the spike-like object may well have been undertaken in self-defense for the purpose of disarming the irate defendant. Defendant's action in proceeding to shoot Necci five times under these circumstances cannot, under any reasonable view of the evidence, be deemed justified.

In light of the overwhelming evidence of guilt and in the

absence of any substantial likelihood that a variation of the justification charge would have resulted in a contrary verdict, reversal of the judgment of conviction is not warranted in the interest of justice *(see, People v Swinson,* 109 AD2d 1108). To the extent that *People v Fuller* (108 AD2d 822, *supra)* is to the contrary, we deem the broad language thereof to be inapplicable where, as here, the justification defense has been seriously impaired by the fact that defendant, who clearly had a size advantage over his victim, shot the decedent no less than five times.

Inasmuch as defendant's remaining contentions are devoid of merit, the judgment appealed from should be affirmed.

BROWN, J. (dissenting). I cast my vote for reversal of the judgment of conviction and would dismiss the indictment without prejudice to the People to re-present any appropriate charges to another Grand Jury *(see, People v Beslanovics,* 57 NY2d 726).

The issue on this appeal boils down to whether this court should exercise its discretionary interest of justice jurisdiction *(see,* CPL 470.15 [6]) to review an erroneous instruction on the defense of justification *(see,* Penal Law § 35.15). I conclude that under the facts of this case, where the issue of justification was the key factor in determining defendant's guilt or innocence, such jurisdiction should be exercised, notwithstanding the lack of proper objection to the instruction at trial and the failure of appellate counsel to raise the issue in his brief on appeal.

Defendant was indicted, *inter alia,* for the crime of murder in the second degree arising out of the fatal shooting of one Edward Necci on May 19, 1982. There is no question but that defendant shot the victim. The only disputed issues at trial—and at defendant's first trial at which the jury could not agree upon a verdict—were the circumstances under which the shooting occurred and whether defendant was justified in his actions. While the evidence presented raised a number of credibility issues for the jury as trier of the facts, there was significant evidence presented from which the jury could have concluded that defendant acted justifiably in shooting Necci. In light of the evidence offered in support of the justification defense as hereinafter set forth, it is my view that it cannot be said that there was such overwhelming evidence of guilt that an error in the instruction on justification was harmless *(cf. People v Swinson,* 111 AD2d 275).

The shooting occurred in defendant's apartment. Other than the defendant and the victim, the only other person present in the apartment was one Marc McDermott who had been a friend of the defendant for six years and also had known the victim Necci for several months prior thereto. According to McDermott, on the day of the shooting he was painting the front room of the second floor apartment in which the defendant was residing when the door bell rang. At defendant's request he went downstairs and admitted Necci. The two men came upstairs to the front room and, after a brief conversation with McDermott, Necci walked down the hall to the living room where defendant was seated. McDermott heard the living room door close. About 20 minutes later, he heard arguing from the living room and then heard defendant say the words "rip off", followed by a single gunshot. McDermott ran down the hall to the living room and opened the door. There he saw defendant pointing a gun at Necci. Defendant told McDermott to stay where he was and told Necci to turn around and put his hands behind his back. Necci started to turn around, but then turned back toward defendant. Twice more defendant ordered him to turn around. Then, according to McDermott, after the third warning, Necci lunged at defendant, holding a silvery spike-like object in his hand. As Necci lunged and the defendant backed up, McDermott heard a number of gunshots in rapid succession and then the sound of breaking glass. At the sound of the gunshots, McDermott ducked behind a wall and when he looked into the room again, he saw defendant struggling to get up from the floor. A broken glass coffee table was beneath the defendant, and Necci was standing over him. Necci then ran from the room past McDermott, who grabbed him by the back of his collar. As Necci ran down the steps, McDermott was pulled onto the bannister and Necci wrenched free of his grip. McDermott then saw defendant emerge from the living room with the gun in his hand and follow Necci down the stairs. McDermott did not follow the defendant.

Within minutes thereafter, Police Officer Antonio Gutierrez, defendant's next door neighbor, came out of his house to investigate the shots. Gutierrez found the victim kneeling on the floor of a pizzeria down the block. He was unsuccessful in his efforts to determine who had shot Necci. He then saw defendant standing in the entranceway to his apartment building and, as other police officers arrived at the scene, defendant summoned him. Gutierrez walked over to defendant

and said, "what's up Buddha [defendant's nickname]? You know a guy just got shot?" Defendant responded, "Yes, I know". Upon further inquiry defendant stated, "There's me and another guy," and "It happened here". At that point, Gutierrez summoned the uniformed officers. As they approached, defendant stated to Gutierrez, "Tony, the guy tried to rip me off. He pulled a gun on me, we struggled, and I shot him". Defendant gave a similar statement to one of the arresting officers, claiming, "I know the guy. We argued, we fought. I shot him". Defendant's statement to the police officers also revealed that Necci had apparently come to see defendant, seeking money in exchange for information he had about a prior burglary of defendant's apartment. Defendant also presented circumstantial evidence which indicated that Necci was in desperate financial straits.

The trial record also indicates that the police recovered a pair of pliers at the foot of the stairs leading to defendant's apartment, which, it was argued, may have been the silvery object seen by McDermott in the victim's hand as he lunged at the defendant. Further, notwithstanding the fact that defendant shot Necci five times, it appears that not only was Necci able to knock defendant down and remain standing after being shot, but he was able to flee from the apartment, walk down the stairs to the street and make his way to the pizzeria where he was found by Gutierrez. Thus, even though defendant fired at least five shots, the reasonableness of his actions in allegedly attempting to ward off Necci presented a clear issue of fact. Moreover, there was testimony by one of the People's witnesses, a police officer, to the effect that an automatic pistol such as the one used in the shooting has a tendency to fire more unexpectedly than a revolver. It was never clearly established at trial whether the gun belonged to defendant or to Necci.

After the close of all of the evidence, defense counsel specifically requested, *inter alia,* that the court charge that portion of the justification defense which provides that a person may use deadly physical force upon another person if "[h]e reasonably believes that such other person is committing or attempting to commit a * * * robbery" (Penal Law § 35.15 [2] [b]), and the court agreed to so charge. Thereafter, the court charged the jury on the justification defense,[1] stating

---

1. The full language of the court's charge on the issue of justification is set forth in the majority opinion.

with respect to the justified use of deadly physical force, as follows: "A person may not use deadly physical force upon another person * * * unless he reasonably believes that such person is using or about to use deadly physical force. Even in such case, however, he may not use deadly physical force if he knows that he can, with complete safety to himself and others, avoid the necessity of doing so by retreating. Except that he is under no duty to retreat if he is in his dwelling and not the initial aggressor. Or he reasonably believes that such person is committing or attempting to commit a robbery." This charge on justification, although it follows the statutory language *(see,* Penal Law § 35.15 [2]), is misleading in that it obscures the distinction between the two independent bases for the justified use of deadly physical force outlined in Penal Law § 35.15 (2) (a), (b) *(see, People v Fuller,* 108 AD2d 822).[2]

The first of the two bases for the justified use of deadly physical force is set forth in Penal Law § 35.15 (2) (a) and concerns the use of deadly physical force where the accused "reasonably believes that such other person is using or about to use deadly physical force". Contained within that paragraph, as well, is the so-called duty to retreat, which states that "the actor may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating", and the exceptions to the duty to retreat, to wit, where the accused is in his dwelling and is not the initial aggressor, or where the accused is a police officer or peace officer or a person assisting one of these officers at the latter's direction pursuant to Penal Law § 35.30 (Penal Law § 35.15 [2] [a]). The second independent basis for the justified use of deadly physical force and the one which is at issue in the instant case is contained in Penal Law § 35.15 (2) (b). It provides that the accused may use deadly physical force upon another person if "[h]e reasonably believes that such person is committing or attempting to commit a kidnapping, forcible rape, forcible sodomy or robbery" (Penal Law § 35.15 [2] [b]). It is important to note that in order to find the justified use of deadly physical force under this paragraph it is not necessary to conclude that the accused harbored a reasonable belief concerning the imminent use of deadly physical force by the other person, as is required under Penal Law § 35.15 (2) (a).

---

2. The third independent basis for the justified use of deadly physical force which is set forth in paragraph (c) was neither requested nor charged (Penal Law § 35.15 [2] [c]).

Under the facts of this case, the jury, had they been properly instructed, could have concluded that defendant acted justifiably to prevent Necci, the victim, from robbing him, even though they did not find that he reasonably believed that Necci was threatening him with deadly physical force. Due to the confusion in the charge, however, the jury may well have concluded that although defendant believed Necci was attempting to rob him, and was using unlawful physical force with the pliers as a weapon, Necci's actions did not carry with them the imminent threat of deadly physical force and, therefore, defendant was not permitted to respond with deadly physical force. As indicated, that is not the law. While defense counsel did not object to the court's failure to explain this distinction, he had, prior to the jury's being charged, requested in writing that the independent basis for using deadly physical force contained in Penal Law § 35.15 (2) (b) be charged. While concededly this was not sufficient to preserve the issue for review as a matter of law, since "[w]hen a Judge grants a request to charge and then fails to deliver the charge as requested, the requesting party has an obligation to draw the error to the Judge's attention" *(People v Whalen,* 59 NY2d 273, 280; *cf. People v Le Mieux,* 51 NY2d 981), this court may nevertheless review the issue as a matter of discretion pursuant to its interest of justice jurisdiction *(see,* CPL 470.15 [6]). By statute, we are authorized to reverse or modify a judgment as a matter of discretion in the interest of justice where we find "[t]hat an error or defect occurring at a trial resulting in a judgment, which error or defect was not duly protested at trial as prescribed in subdivision two of section 470.05 [of the Criminal Procedure Law] so as to present a question of law, deprived the defendant of a fair trial" (CPL 470.15 [6] [a]).

In *People v Fuller* (108 AD2d 822, *supra)* this court was presented with the virtually identical issue to the one at bar, i.e., review of an erroneous justification charge which had neither been preserved at trial nor raised in the appellate brief (although apparently raised at oral argument). In *Fuller,* we reversed a murder conviction in the interest of justice for the second time *(see, People v Fuller,* 74 AD2d 879), on the ground that the justification charge treated Penal Law § 35.15 (2) (b) (by permitting the use of deadly physical force to thwart a robbery) "as if it were merely an additional clause of paragraph (a) [of Penal Law § 35.15 (2)] dispensing with the duty to retreat, rather than what it truly is, namely, an

independent basis for permitting the use of deadly physical force" *(People v Fuller,* 108 AD2d 822, 823, *supra).*

Recently, in *People v Swinson* (111 AD2d 275, *supra),* this court was presented with a similar situation involving an unpreserved and unbriefed issue concerning an inadequate justification charge. In *Swinson (supra),* the trial court erroneously instructed the jury to use an objective reasonable person standard for evaluating the defendant's actions, rather than a subjective standard of what defendant himself thought *(see, People v Miller,* 39 NY2d 543; *People v Macon,* 110 AD2d 718; *People v Long,* 104 AD2d 902; *People v Wagman,* 99 AD2d 519).* The majority of this court acknowledged the defect in the charge, but noted that no timely objection had been made so as to alert the court and permit it to correct the defect in the charge. Thus, they concluded the error was not preserved for review as a matter of law. The court then proceeded to point out why, in light of the strong evidence of guilt, invocation of the court's interest of justice jurisdiction was not warranted. Implicit in this reasoning was the conclusion that, notwithstanding the failure to raise the issue either before the trial court or in the brief on appeal, the issue was nonetheless subject to review by this court under our discretionary interest of justice review power. As noted, the majority declined to exercise that power, however, because of what it found to be overwhelming evidence of guilt. The question of the reviewability of the issue was addressed in greater depth in the partial dissent of our former colleague and now Associate Judge Titone of the Court of Appeals, who stated:

"As the majority concedes, there can be no question that the use of an objective standard was error *(e.g., People v Miller,* 39 NY2d 543; *People v Macon,* 110 AD2d 718; *People v Long,* 104 AD2d 902; *People v Wagman,* 99 AD2d 519; *People v Desmond,* 93 AD2d 822). 'The court erred in enunciating an "ordinary reasonable person" standard for the evaluation of defendant's actions, rather than having the jury consider what defendant himself thought' *(People v Wagman, supra,* at p 520). The majority declines to review the issue in the interest of justice, however, a decision I fear may rest on the failure of defendant's counsel—assigned by this court—to expressly raise the issue in the appellate brief.

"An unbroken line of authority, only recently affirmed *(People v Fuller,* 108 AD2d 822), holds that 'in cases where justification is the central issue to be decided' an 'error [in the justification charge] warrants a new trial in the interests of

justice' *(People v Fuller,* 74 AD2d 879; *see, People v Macon, supra; People v Long, supra; People v Wagman, supra,* at p 520; *People v Jenkins,* 93 AD2d 868, 869; *People v La Susa,* 87 AD2d 578; *People v Flores,* 75 AD2d 649; *People v Davis,* 74 AD2d 607). Interest of justice review is particularly warranted where an objective standard is erroneously employed because of 'its potential for harm' *(People v Wagman, supra,* at p 520).

"These decisions are ignored by the majority, which purports to focus on the 'strong evidence' of guilt. It is evident from reading the record, however, that the issue of justification was the *only* issue in the case, defendant having turned himself into the police shortly after the incident, and that question presented a pure issue of credibility for the jury. Defendant took the stand and testified, *inter alia,* that the victim had attacked him on prior occasions. This testimony was corroborated by an independent witness and physical evidence. Although the ice pick was never discovered, this is hardly surprising inasmuch as the scene was never cordoned off. In addition, the medical examiner's testimony concerning the powder burns is somewhat suspect given the victim's three-day hospital stay prior to her demise. In sum, it is enough to say that the issue of justification turns upon disputed facts. Since the jury was not presented with the proper yardstick, our prior precedents dictating reversal should be followed.

"As I have indicated, appellate counsel has not urged the plainly erroneous justification charge as a basis for reversal. Although we are not bound by the parties' formulation of the issues *(Matter of Geneseo Cent. School [Perfetto & Whalen Constr. Corp.],* 53 NY2d 306, 312, n 2; *Rentways, Inc. v O'Neill Milk & Cream Co.,* 308 NY 342, 349; *People v Danzy,* 104 AD2d 949, 953; Witkin, Manual on Appellate Court Opinions § 85, at 154), I do not think that we ought to affirm without further enlightenment from the defendant and the People, at the very least *(see, Matter of Geneseo Cent. School [Perfetto & Whalen Constr. Corp.], supra,* at p 312, n 2)" *(People v Swinson,* 111 AD2d 275, 278-279, *supra).*

I am satisfied that in this case the interest of justice requires that this court, *sua sponte,* review the clearly erroneous justification charge *(see, People v Fuller,* 108 AD2d 822, *supra),* and upon so doing reverse the conviction and dismiss the indictment with leave to the People to re-present the case to another Grand Jury *(see, People v Beslanovics,* 57 NY2d 726, *supra).* Clearly, the key issue in this case was defendant's

claim of justification. The evidence presented was reasonably subject to interpretation by the jury that defendant acted justifiably to prevent a robbery. Therefore, it was crucial that the jury be given the proper instructions on how to evaluate the evidence. In my view, in light of the misleading charge on the issue upon which the whole case turned, we are obligated to address the issue, notwithstanding the failure of counsel to properly preserve it and formally present it for review. Our mandate to do justice should not be bound or hampered by the oversight of counsel. Where an error, which has not been preserved for review as a matter of law *(see,* CPL 470.05 [2]), is nonetheless one which may have served to deprive a defendant of a fair trial, this court's authority to exercise its discretionary review powers to see that justice is achieved *(see,* CPL 470.15 [6]) should not be limited by the formulation of the issues by counsel *(see, Matter of Geneseo Cent. School [Perfetto & Whalen Constr. Corp.],* 53 NY2d 306, 312, n 2; *Rentways, Inc. v O'Neill Milk & Cream Co.,* 308 NY 342; *People v Danzy,* 104 AD2d 949).

GIBBONS, J. P., and EIBER, J., concur with WEINSTEIN, J.; BROWN, J., dissents and votes to reverse and dismiss the indictment without prejudice to the People's re-presenting any appropriate charges to another Grand Jury *(see, People v Beslanovics,* 57 NY2d 726).

Judgment of the Supreme Court, Queens County, rendered November 23, 1983, affirmed.